IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD B. FEINBERG | : | CIVIL ACTION |
| Plaintiff, | : | NO. 05-4847 |
| v. | : | |
| I. ISABELLE BENTON, and<br>BENTON PARTNERS II LLP, | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                                                                December 13, 2007

       Presently before the Court are Defendants' Renewed Motion for Summary Judgment (Docket No. 63), Plaintiff's Answer in Opposition (Docket No. 70), Defendants' Reply Brief (Docket No. 72), Plaintiff's Sur Reply (Docket No. 79), Defendants' Response to Plaintiff's Sur Reply (Docket No. 80), the Verified Statement of Richard B. Feinberg (Docket No. 83), and Defendants' Letter in Response to Plaintiff's Verified Statement (Docket No. 84).  For the reasons stated below, Defendants' Motion for Summary Judgment is **DENIED**.

## I. INTRODUCTION

       On November 30, 2004, Plaintiff, Richard B. Feinberg, sold to Benton Partners II LLP (BPII) one hundred shares of stock in the Philadelphia Stock Exchange (PHLX).  I. Isabelle Benton, who controlled BPII, sat on the Governing Board of the PHLX.  In the next several months, the value of the stock skyrocketed, as a number of negotiations with outside investors took place to sell an equity stake in the PHLX.  Plaintiff claims in Count I that BPII, by trading

on inside information, violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder; and in Count II that Benton is liable as a control person of BPII under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t.  Plaintiff seeks either rescission of the sale or damages.

## II.  BACKGROUND

The PHLX was a mutual organization that in January 2004 converted to a stock corporation by way of a process called demutualization.  Members of the former organization—known as seat owners—became shareholders, each seat converting to one hundred shares that could be sold on a private exchange. (Defs.' Mem. Sup. Renewed Mot. Sum. J. 5-6.) Plaintiff was one such seat owner who became a shareholder.  He purchased his seat in 2003 for $18,000. (Feinberg Dep. 19:15-20:24, July 12, 2006.)

In the summer of 2004, Plaintiff decided to sell his one hundred shares.  He believed that the PHLX was a bad investment; indeed, he had been warned by the PHLX of near financial crisis during the demutualization period.  This crisis had been the purported motivation for demutualization, a process that would help the PHLX in its efforts to seek a greatly needed infusion of capital. (Id. at 37-48.)

On November 23, 2004, Plaintiff offered to sell his shares at a price of $25,000. When his offer went unanswered, he lowered it to $20,000. (Id. at 29-30.)  I. Isabelle Benton, through BPII, the corporation that she controlled, accepted the revised offer on November 30, 2004, paid $20,000, and on December 1, 2004, the sale became official.  Plaintiff did not know who the buyer was until after his offer had been accepted, and he had no discussions with Benton throughout the sale process. (Feinberg Dep. 32:21-24.)

As it turned out, Benton was a member of the Governing Board of the PHLX. She was elected to that position in March 2003. (Benton Dep. 44:7-15, Sept. 26, 2006.) Members of the Governing Board are responsible for, among other things, designating who serves on standing committees and administering the various operations of the PHLX, including hiring and supervising a staff.  While on the Board, Benton sat on several committees, including the Automation, Demutualization Advisory, Executive, Finance, Nominating and Elections, Floor Procedure, and Foreign Currency Options Committees. (Answer ¶ 24.)

Shortly before making the purchase of Plaintiff's stock, Benton wrote a letter to the PHLX Shareholder Services Department, stating, "I do not believe that I am aware of privileged or confidential information that would affect the investment value of the PHLX stock." (Defs.' Mem. Sup. Renewed Mot. Sum. J., Ex. 9.)  The letter was dated November 3, 2004, but at least as of December 10 or 11, the letter had not been delivered to the Shareholder Services Department. (Benton Dep. 161:17-162:4.)

Prior to demutualization, Benton never owned more than three seats on the PHLX. In December 2004, after buying Plaintiff's shares, Benton bought an additional 600 shares of PHLX stock. (Answer ¶¶ 26-27; Benton Dep. 132.)  Benton explained that she bought these shares because she considered recent improvements in PHLX technology to have increased the value of the exchange. (Benton Dep. 149-50.)  The evidence suggests that the PHLX completed these improvements as of at least March, 2004—nine months prior to the trade with Plaintiff. (See Defs.' Mem. Sup. Renewed Mot. Sum. J., Ex. 6; Pl.'s Sur Reply, Ex. 5, at 3.)  Benton also explained that she wanted to "put [her] money where [her] mouth [was]" and support the PHLX. (Benton Dep. 149-50.)

In late 2004 and into 2005, the PHLX engaged in numerous negotiations and eventually sold a substantial part of its equity in a series of transactions that dramatically increased the value of the PHLX stock. Beginning in November 2004, the PHLX negotiated with Archipelago Holdings LLC ("Archipelago"), which offered fifty million dollars in 2005 to acquire all of the PHLX stock. (Id.) The PHLX rejected this offer. (Id.) The PHLX also negotiated with Citadel Derivatives Group LLC ("Citadel") beginning in the fall of 2004, but these negotiations never resulted in an offer. (Id. at 2.)

On June 16, 2005, the PHLX announced that Merrill Lynch and Citadel each had acquired a ten percent stake in the PHLX, with a possible option to buy double that amount. (Defs.' Mem. Sup. Renewed Mot. Sum. J., Ex. 14.) On August 16, 2005, the PHLX announced that Morgan Stanley had acquired ten percent of the PHLX for $7.5 million, and that Citigroup, Credit Suisse First Boston, and UBS each acquired five percent for $3.75 million. Each of these companies also retained a possible option to double its stake. (Defs.' Mem. Sup. Renewed Mot. Sum. J., Ex. 15.) While it is unclear what the value of the stock became after the sales in June and August, it was much greater than $20,000 per one hundred shares. The rejected Archipelago offer would have resulted in a $90,000 value per 100 shares of PHLX stock. (Pl.'s Sur Reply, Ex. 5, at 3.)

## III.  LEGAL STANDARD

A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

4

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Because a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The ultimate question in determining whether a motion for summary judgment should be granted is "whether reasonable minds may differ as to the verdict." Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 129 (3d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

After the moving party satisfies its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 256-57.  Rule 56 of the Federal Rules of Civil Procedure requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986).  "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. at 323.

## IV.  DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 coupled with Rule 10b-5 create a liability scheme for securities fraud.  Section 10(b) provides,

> It shall be unlawful . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in

>contravention of such rules and regulations as the [Securities Exchange Commission (SEC)] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC to enforce section 10(b), provides a private cause of action.  Rule 10b-5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5.

Here, Plaintiff claims that BPII engaged in insider trading by failing to disclose material nonpublic information that BPII had come to know as a result of its insider status.  The elements for an insider trading claim under Rule 10b-5 are: (1) the defendant made a materially false or misleading statement or omitted a material fact; (2) the defendant acted with scienter; and (3) the plaintiff relied on the defendant's misstatements or omissions and this caused the injury. Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004).  An omission, which is the charge here, may be the basis for liability only where the defendant has a duty to disclose information. See Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir.2000).  An insider, such as an officer or board member, owes such a duty of disclosure. See id.  Thus, if an insider has material inside information, omission of that information while trading with a non-insider may form the basis of a 10b-5 claim. See generally In re Matter of Cady, Roberts & Co., Securities Act Release No. 34-6668, 40 S.E.C. 907 (Nov. 8, 1961) ("An affirmative duty to disclose material information has been traditionally imposed on corporate 'insiders,' particularly officers, directors, or controlling stockholders. . . .  [I]nsiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom

6

they deal. . . . [If] disclosure prior to effecting a purchase or sale would be improper or unrealistic under the circumstances, we believe the alternative is to forego the transaction." (footnote omitted)).

Despite a great deal of argument, the parties essentially agree on the above legal framework. The sole issue is whether Plaintiff has produced enough evidence to survive this motion for summary judgment. Plaintiff has clearly established some of the elements of an insider trading claim. Benton, as a Governing Board member, was an insider. To the extent that Plaintiff has shown that Benton omitted material information, Plaintiff has sufficiently demonstrated that he relied on it. His assertion that he would not have traded if he knew what he contends Benton knew is sufficient to survive summary judgement. Plaintiff also clearly suffered damage by selling his stock for $20,000 when several months later it was worth many times more.

This leaves two factual issues in dispute. The first is whether there is sufficient evidence of any material information that Benton could possibly have had on November 30, 2004. The second is whether there is evidence that Benton was in fact aware of this information on November 30, 2004. These two issues are considered in turn.

### A. MATERIAL NONPUBLIC INFORMATION

Plaintiff contends that there were three pieces of information Benton had that she failed to disclose. The first is that in November 2004, the PHLX began negotiations to sell the exchange to Archipelago. The second is that in the fall of 2004, the PHLX negotiated with Citadel Investment Group, LLC, to sell a stake in the exchange. The third is that in 2002 there

was a valuation of the company done by a third party, Keefe Bruyette & Woods (KBW), that pegged the value of the company at between $250 and $350 million.

As to each of the negotiations, there are two questions, one factual and one legal. The factual question is whether there were indeed negotiations prior to November 30, 2004. The legal question is whether the negotiations rise to the level of material information. As to the legal question, information is deemed material when it would affect the average investor's decision to trade. See In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 290 (3d Cir. 1999) (noting that information is material only if "'there is a substantial likelihood that a reasonable shareholder would consider it important'" (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976))). The omission of information is not material if it is speculative, unreliable, or contingent. See id. In the context of negotiations for a merger, a court must consider the likelihood of the transaction occurring and the magnitude of the transaction in relation to the organization as a whole. See Basic Inc. v. Levinson, 485 U.S. 224, 238-40 (1988). For example, preliminary talks concerning a hypothetical acquisition might not be material because they lack certainty, or because the potential acquisition is small relative to the overall business, or some combination of these two factors. See id.

With respect to the Archipelago negotiation, the key piece of evidence is a report issued by the PHLX on April 18, 2005. This report stated, "[S]ince late November 2004, management, with guidance [from the Special Committee on Strategic Alliances], conducted an extensive negotiation with Archipelago Holdings Inc. which has resulted in a relatively firm offer to acquire all the stock of the PHLX for $50 million . . . ." (Pl.'s Sur Reply, Ex. 5, at 1.) The report went on to explain, "[T]his represents a price of $900 per share or $90,000 for each former

8

PHLX seat." (Id. at 4.) By the PHLX's own account, the negotiations were extensive and resulted in a firm offer. Knowledge of the ultimate offer—worth $90,000 to each former seat owner, such as Plaintiff—obviously would have made any investor rethink a decision to sell the stock for $20,000. These extensive negotiations began in late November 2004, according to the report, meaning they almost certainly began sometime before the transaction between Benton and Plaintiff, which took place on November 30, 2004, the last day of that month. The fact that the PHLX eventually rejected the offer does not make this information immaterial. At the very least, these extensive negotiations indicated a level of interest in the PHLX from outside investors at a price far greater than Benton and Plaintiff's transaction.

It is not entirely clear from this report just how extensive the negotiations were as of November 30, 2004. The report does not lay out a time line of the negotiations. The report merely states that there were extensive negotiations "since late November," which suggests that there was at least some likelihood of an eventual offer since that time. The magnitude of this transaction is also very high. The parties were negotiating a sale of all of the stock of the PHLX. There can be no transaction of greater significance to a company. Thus, the Court concludes that a reasonable juror could find that nonpublic information concerning negotiations with Archipelago existed as of November 30, 2004, and that this information was material.

The information on the Citadel negotiations, on the other hand, was less concrete. Again referring to the report of April 18, 2005, the PHLX stated that it had discussions with Citadel in the fall of 2004. (Pl.'s Sur Reply, Ex. 5, at 3.) However, these discussions involved a "strategic investment" only. The negotiations ended because the PHLX was "unable to deliver a satisfactory portfolio of specialist books." (Id.) The Court therefore concludes that information

concerning this negotiation does not rise to the level of material information because the submitted evidence does not indicate that there was ever a high probability that a deal, or even a firm offer, would occur. Moreover, the magnitude of this potential deal was small in comparison with the deal discussed in the Archipelago negotiations.

It is unclear whether Plaintiff's final alleged piece of undisclosed material information—the 2002 KBW valuation—rises to the level of material information. Plaintiff has failed to produce a copy of the 2002 valuation as evidence. Therefore the Court cannot determine if it is material. See Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 643 (3d Cir. 1989) (listing specific factors a court should consider in evaluating whether omitted information that is speculative in nature—such as projections, estimates, or forecasts—is material). It is Plaintiff's burden to establish the elements of an insider trading claim. Plaintiff has not met his burden here, as to materiality. In any event, because the Court concludes that there is no evidence Benton knew about the valuation, see Part IV.B infra, an insider trading claim based on the 2002 valuation must be dismissed.

### B.  BENTON'S KNOWLEDGE OF MATERIAL NONPUBLIC INFORMATION

Having established that there is an issue of fact concerning the materiality of the negotiations with Archipelago, Plaintiff still must show that Benton was aware of these negotiations. To establish this state of mind, a plaintiff must plead facts that either (1) constitute circumstantial evidence of either reckless or conscious behavior or (2) establish a "motive and opportunity" to commit fraud. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006). The Third Circuit has held that the mere fact that an insider has traded does not

support an inference of scienter. In re Advanta, 180 F.3d 525, 540 (1999) (citing In re Burlington, 114 F.3d at 1424). "Instead, plaintiffs must allege that the trades were made at time and in quantities that were suspicious enough to support the necessary strong inference of scienter." In re Burlington, 114 F.3d at 1424. There are a variety of factors typically taken into account in determining whether there is sufficient circumstantial evidence of knowledge, including "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, and the number of insiders involved." In re Suprema, 438 F.3d at 277. Additionally relevant is whether the sales were "normal and routine" and whether profits were great compared to the defendant's compensation. In re Burlington, 114 F.3d at 1423.

In Tellabs, Inc. v. Makor Issues & Rights, Ltd., the Supreme Court recently took up the question of scienter.[1] 127 S. Ct. 2499 (2007). The Court stated that there must be a strong inference of scienter drawn from all the facts, and, additionally, that "the court must take into account plausible opposing inferences." Id. at 2509. The Court held that the inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510.

Defendants argue that the only evidence of Benton's knowledge of the negotiations and the valuation is that she was a member of the Governing Board. (Defs.' Mem.

---

1.  Tellabs considered scienter in the context of a motion to dismiss and in light of the pleading requirements for a securities fraud claim imposed by the Private Securities Litigation Reform Act (PSLRA). At least one circuit has found that the PSLRA's requirements do not change the substantive elements of a 10(b) claim and therefore that the cases interpreting the PSLRA are not controlling when deciding motions for summary judgement. See Howard v. Everex Sys., Inc., 228 F.3d 1057, 1064 (9th Cir. 2000) ("Because the PSLRA did not alter the substantive requirements for scienter under § 10(b), however, the standard on summary judgment . . . remains unaltered . . . ."). Without weighing in on whether this conclusion is correct, this Court believes the Tellabs analysis is at least instructive in the summary judgement context.

Sup. Renewed Mot. Sum. J. 18.)  Drawing an inference of scienter from her position with the PHLX is impermissible, the argument goes, because while "'[a] director, officer, or even the president of a corporation often has superior knowledge and information, . . . neither the knowledge nor the information invariably attaches to those positions.'" (Id. (quoting In re Advanta, Corp., No. 97-CV-4343, 1998 WL 387595, at *7 (E.D. Pa. July 9, 1998)).)  It is true that knowledge of every piece of company information cannot be imputed to a defendant merely because of his or her position at that company.  However, a court may factor in the position of the defendant as circumstantial evidence when the information is of great importance to the company. See In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (distinguishing In re Advanta on the grounds that "the alleged fraud did not relate to the corporation's core business," whereas "the alleged fraud in this case relates to the core business"); accord In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999) (distinguishing a Minnesota case that found scienter at least in part based on the defendant's position because that "court expressly based its holding on the facts that the contract 'was undeniably the most significant contract in [the company's] history,' thus supporting an unusually strong inference of scienter.'").

      Turning to the facts here, Plaintiff has produced evidence that beginning in November 2004 Archipelago was negotiating to buy all of the PHLX stock.  The PHLX was struggling financially up to that time, having failed to post profits for several years running.  Thus, a complete sale for a substantial price was an extremely important piece of information.  Benton was a member of the Governing Board and sat on several committees.  Given these facts, Benton's position constitutes circumstantial evidence of scienter, although, in and of itself,

probably not enough to survive a motion for summary judgment. However, the timing of BPII's purchase from Plaintiff is further circumstantial evidence of scienter. The Archipelago negotiations began in late November 2004. BPII purchased Plaintiff's stock on November 30, 2004. Benton did not own more than three seats at any time prior to demutualization. Yet she bought 700 shares of stock in less than a month—all immediately after the Archipelago negotiations commenced. The size of the profits she made from this purchases is also significant. Even the rejected Archipelago offer would have resulted in profits of 350%. Moreover, as Tellabs instructs, this inference is at least as compelling as any alternative inference. Benton claims she bought the stock based on her view that the value of the PHLX stock would rise due to its new technology. But the technology had been in place for several months prior to the trade. Thus, her explanation does not explain the fortuitous timing of the trade. Benton also claims that she wanted to support the PHLX by purchasing its stock, but as Plaintiff notes, it is unclear how purchasing stock from a third party would support the PHLX, since the PHLX would not receive any funds from such a sale. There is thus a strong inference—at least as strong as any opposing inference—of scienter.

        In contrast, there is not enough circumstantial evidence of scienter with regard to the Citadel negotiations or the 2002 valuation. Neither piece of information rises to the level of importance of the Archipelago negotiations, and thus the mere fact that Benton was on the Governing Board does not create the same inference. Moreover, the timing of the 2002 valuation supports the conclusion that Benton had no knowledge of it. The valuation was produced prior to Benton's appointment to the Governing Board, and she did not make her trades until two years later. See In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (concluding sales

of stock three, four, and twelve months before the disclosure of alleged inside information "defeats any inference of scienter" because there was a "broad temporal distance between stock sales and a disclosure of bad news.").

Accordingly, the Court denies Defendants' motion for summary judgment on both Counts I and II with respect to the undisclosed information regarding the Archipelago negotiations only. The Court concludes that Plaintiff has established issues of material fact on each element of a 10b-5 claim for insider trading against BPII (Count I). Since "[s]ection 20(a) imposes joint and several liability on any person who controls a person liable under any provision" of the Securities Exchange Act, essentially creating derivative liability for control persons, <u>Shapiro v. UJB Fin. Corp.</u>, 964 F.2d 272, 279 (3d Cir.1992),[2] Count II against Benton survives as well.

## V.  CONCLUSION

For the reasons stated above, the Court denies Defendants' Motion for Summary Judgement. An Order consistent with this Memorandum follows.

---

2. Under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, plaintiffs must "prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." <u>Shapiro</u>, 964 F.2d at 279. Here, the controlled person is BPII. There is no dispute that Benton controlled BPII. Thus, because Plaintiff has survived the motion for summary judgement on his Rule 10b-5 claim against BPII, his Section 20(a) claim against Benton survives as well.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD B. FEINBERG | : | CIVIL ACTION |
| Plaintiff, | : | NO. 05-4847 |
| v. | : | |
| I. ISABELLE BENTON, and<br>BENTON PARTNERS II LLP, | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this 13th day of December, 2007, upon consideration of Defendants' Renewed Motion for Summary Judgment (Docket No. 63), Plaintiff's Answer in Opposition (Docket No. 70), Defendants' Reply Brief (Docket No. 72), Plaintiff's Sur Reply (Docket No. 79), Defendants Response to Plaintiff's Sur Reply (Docket No. 80), the Verified Statement of Richard B Feinberg (Docket No. 83), and Defendants' Letter in Response to Plaintiff's Verified Statement (Docket No. 84), it is hereby **ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**.

BY THE COURT:

*s/ Ronald L. Buckwalter, S. J.*
RONALD L. BUCKWALTER, S.J.